THE STEUBENVILLE BRIDGE COMPANY, A DISSOLVED CORPORATION, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9208–9212, 12120–12121, 12183–12184, 12192–12195, 12231–12232, 12250, 12253–12262, 12265.

Promulgated November 8, 1948.

*P. G. Rodewald, Esq., Chesney M. Carney, Esq., John D. Ray, Esq., J. M. Reed, Esq., Sidney Gambill, Esq., L. Weinberger, Esq., Elmer E. Myers, Esq., William Wallace Booth, Esq.,* and *Wm. P. Nottingham, Esq.,* for the petitioners.

*Stanley L. Drexler, Esq.,* for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith : S. J. Hyman, Asserted Transferee of The Steubenville Bridge Company ; Estate of Samuel Biern, Asserted Transferee of The Steubenville Bridge Company, Marion M. Biern, Executrix ; Stanley M. Cooper, Asserted Transferee of The Steubenville Bridge Company ; Estate of George I. Neal, Deceased, Asserted Transferee of The Steubenville Bridge Company, George I. Neal, Jr., and Irene Neal Elliott, Executors ; J. Nesbit McDonald ; Edward McDonald ; Robert McE. Wright ; Estate of Samuel H. Putnam, Deceased, Samuel H. Putnam, Jr., Executor ; Samuel H. Putnam, Jr., Executor of the Estate of Samuel H. Putnam (Deceased) ; The Citizens National Bank of Washington, Successor Trustee to Sydney B. Donnan, Surv. Tr. U–A of John W. Donnan, DTD. 1911 & Amended 1918 ; Samuel H. Putnam, Jr. ; Florence C. Beatty ; Emma B. Woodhull ; American Water Works and Electric Company, Inc. ; P. Emery Huth ; Joseph G. Huth ; Charles Conway McDonald ; Henry C. Camp ; Charles A. Camp ; Glenn C. Camp ; J. Gordon Camp ; Marguerite M. Yost ; Walter M. Yost ; Estate of Tillie E. Camp, Deceased, Charles A. Camp, Executor ; and West Penn Railways Company.

**OPINION.**

HARLAN, *Judge*: A corporation possessed of assets and desiring to liquidate may legally take either of two courses. It may sell the assets and distribute the cash to its stockholders, or it may distribute the assets to its stockholders in kind. The Internal Revenue Code sets

forth the tax consequences of both proceedings. However, there is nothing in the code, the regulations, or the decisions requiring a corporation to choose that course in liquidation which will result in the greatest tax consequences. When a corporation ostensibly makes a distribution in liquidation in kind, but actually carries out thereby a prior agreement to sell the assets involved, then the courts have considered the distribution in liquidation to be a step in a sale by the corporation itself and have taxed the transaction accordingly. The question involved is largely one of fact, and it is along this line of factual distinctions that the authorities cited by the Commissioner and the petitioner divide.

As was said by Judge Hand in *Chisholm* v. *Commissioner*, 79 Fed. (2d) 14, in a case involving a sale by a partnership of assets formerly belonging to a corporation: "The question always is whether the transaction under scrutiny is in effect what it appears to be in form." Also, in *Fruit Belt Telephone Co.*, 22 B. T. A. 440, the Board of Tax Appeals said:

A corporation may clearly do what it has a legal right to do, even for the sole purpose of reducing its tax liability. It is not required to pursue a course which gives rise to a greater tax liability if another course is open to it which will give rise to a less tax.

The basic question in all of these cases involving the tax liability of the corporation or the stockholders on the gain resulting from the sale of corporate assets is as to who made the sale. As to the effect of corporate officers or fiduciaries negotiating a sale while the corporation is still functioning and before any steps in liquidation have been taken, upon the taxability of the gain from the sale, the remarks of the Court in *Wichita Terminal Elevator Co.*, 6 T. C. 1158; affd., 162 Fed. (2d) 513, are much in point:

If, in fact, the sale of petitioner's elevator properties was conceived and negotiated by its president, acting in its behalf prior to its dissolution, and such sale was carried out through an arrangement whereby petitioner was dissolved and the properties to be sold were conveyed to a liquidating agent or to its stockholders and the formal contract to sell was executed by the party or parties then holding legal title, such sale was, for tax purposes, made by the corporation.

If the sale, however, is made by the stockholders after definite measures have been taken by the corporation to liquidate in kind, the cases generally have held the resulting tax on the gain to be the obligation of the stockholders.

An attempt to reconcile all the cases on this point with very complicated factual distinctions would be a voluminous and unfeasible task. We shall limit ourselves to a review of the litigated situations sufficiently to illustrate the distinctions which the courts have generally drawn.

A corporation had but two stockholders owning the entire stock and

these stockholders orally agreed with a prospective purchaser to sell an apartment building, the corporation's sole asset, and the stockholders accepted a down payment thereon. Thereafter they discovered that the tax on the resulting gain to the corporation would be heavy and decided to liquidate the corporation with a distribution of the assets in kind to the stockholders. The stockholders then, as individuals, completed the sale and applied the original down payment made to them, as representatives of the corporation, to the purchase price. This Court held that such a sale, contracted for before steps in liquidation were consummated, was in fact a sale by the corporation. This opinion was sustained by the Supreme Court in *Court Holding Co.* v. *Commissioner*, 324 U. S. 331.

A corporate stockholder conceived a plan to procure options on all corporate stock with the intention, of which the corporation general counsel was fully informed, to procure control over and sell the corporate assets. The corporate counsel conferred with the stockholders and informed them that a direct sale of the assets themselves by the corporation was undesirable because of the "extraordinary tax" to be paid. At a special stockholders' meeting thereafter the president informed the stockholders of the desirability of the corporation going out of business. Five of the stockholders then formed a partnership to engage in the same business as that formerly conducted by the corporation under a name almost identical with that of the corporation and at the same location as the corporation. The corporation transferred its assets to the partnership, which operated the business for two weeks. The partnership then sold the assets to a vendee procured by the stockholder who had obtained options on the corporate stock. The corporation then liquidated. The Court held that the sale had in fact been made by the corporation, which was liable for the tax on the resulting gain. *Meurer Steel Barrel Co.* v. *Commissioner*, 144 Fed. (2d) 282. In this decision the court distinguished *Chisholm* v. *Commissioner, supra,* where the partnership that ultimately sold the assets was a bona fide and continuing entity, not created for the purpose of evading taxes.

For a similar conclusion based upon the ultimate fact that the sale involved was that of the corporation, even though an effort was made in some way to create a different impression, see *R. G. Trippett*, 41 B. T. A. 1254; affd., 118 Fed. (2d) 764; *MacQueen Co.* v. *Commissioner*, 67 Fed. (2d) 857; *Fairfield Steamship Corporation*, 5 T. C. 566; affd., 155 Fed. (2d) 321; certiorari denied, 329 U. S. 774; and *Rose Kaufmann*, 11 T. C. 483.

On the other hand, where the sale has been made by the stockholders after liquidation has been initiated and with no contractual obligations assumed by the corporation prior to the negotiation of

liquidation, the courts have generally taxed the resulting gain to the stockholders. Thus, in *Acampo Winery & Distilleries, Inc.*, 7 T. C. 629, the corporate officers and directors had received a number of offers to purchase the corporate assets, but rejected all of them because of the heavy taxes involved in a sale. Some stockholders consulted an attorney and then sought to procure a purchaser of the corporation stock, but without success. The attorney then suggested distribution of the assets in liquidation and the stockholders thereupon chose three trustees to receive and dispose of the assets. The assets were delivered to the trustees and the corporation dissolved. The trustees later negotiated with and sold the assets to an individual who had theretofore had some negotiations with the corporation. In that case the Commissioner contended that the trustees were merely the representatives of the corporation perfecting the sale. This Court, however, held that the sale was made by the stockholders and not by the corporation.

In *Falcon Co.*, 41 B. T. A. 1128; affd., 120 Fed. (2d) 277, a corporation owning oil leases had received, after negotiation, an offer in writing to purchase certain of its leases, but the directors definitely decided not to sell for the principal reason that the sale would result in very large taxes. The stockholders thereupon passed a resolution to distribute the leases in kind in liquidation in return for 60 per cent of the stock. The sale of the leases by the stockholders followed and this Court held that the stockholders, not the corporation, were taxable for the gain.

In *George T. Williams*, 3 T. C. 1002, a corporation, all of the stock of which was owned by Williams on March 25, 1941, passed necessary resolutions to dissolve and liquidate. While necessary steps in liquidation were in progress Williams signed a contract to sell corporate assets which he expected to receive. This Court held that the resulting profits were not taxable to the corporation. See also *Cooper Foundation*, 7 T. C. 389.

Applying the above law to the facts in the case at bar, the corporate stockholders of Steubenville, prior to their sale of the stock on December 29, 1941, had taken no common action which could be construed as a step in the sale of the bridge to the State of West Virginia. In fact, few if any of them knew of the contemplated sale. None of them, either directly or through their own corporate officers, had ever negotiated in any way with the State of West Virginia. When these stockholders renewed the options which they had given to Baron & Hastings, they did not know the prices that other stockholders were receiving for their options and the sale prices of the stock varied from $1,325 to $4,332. There is no precedent which has been submitted to us or which we have found under these circumstances that would

justify these stockholders being taxed for any gain other than the gain which they realized from the sale of their stock.

When the syndicate contracted with the State Road Commissioner of West Virginia to sell the Steubenville bridge, the syndicate did not even have options on the Steubenville stock, as the contract was made on December 23, 1941, and the assignment of the options to the syndicate occurred on December 24, 1941. At the time of the formation of the contract of sale with West Virginia the syndicate members had no connection with the corporation and no responsibility to the corporation. Their only connection with Steubenville was an agreement with Baron & Hastings that, if a renewal of the options on the Steubenville stock could be procured and the sale of the bridge consummated, the syndicate would pay Baron & Hastings $25,000 for their services. In attempting to procure the assets of the corporation by obtaining all of the corporate stock, the syndicate was taking a step that has been repeatedly recognized as proper and legal. See *Koppers Coal Co.*, 6 T. C. 1209; *Commissioner* v. *Ashland Oil & Refining Co.*, 99 Fed. (2d) 588; and *Prairie Oil & Gas Co.* v. *Motter*, 66 Fed. (2d) 309. After the members of the syndicate procured the stock on December 29, 1941, they promptly called a special meeting of the stockholders at 4 p. m. of the same day to accept the resignation of the old directors and elect new ones. At 4 : 30 p. m. the new directors met and passed a resolution to dissolve and liquidate the assets in kind to the owner of all the corporate stock. At 5 p. m. this liquidation was approved at the stockholders' meeting. There is not one act set forth in the record which was performed by the syndicate, the stockholders, the newly elected officers, the directors, or Steubenville after the syndicate procured the stock on December 29, 1941, that could be remotely construed, in our opinion, as an act or a step in the sale of the bridge prior to the approval of the resolution of liquidation.

On these facts the case at bar is distinguishable from every case which has been cited to this Court or with which this Court is otherwise acquainted where a corporation has been taxed for a capital gain from the sale of assets formerly belonging to a corporation.

Having found, therefore, that petitioner Steubenville Bridge Co. did not make a sale of the bridge involved herein, there is no transferee liability against any of the stockholders of the Steubenville Bridge Co.

Our decision in favor of petitioner Steubenville Bridge Co. makes unnecessary consideration of the additional questions raised herein except as to the payments made by that corporation on adjustments by the Commissioner to its tax computation after the three-year period of limitations had run. As shown in our findings, Steubenville, on March 14, 1946, paid additional income tax in the amount of $5,450.16 and interest thereon in the amount of $1,308.04 for the year 1941. We have found as a fact that it made an overpayment of tax in respect

of the taxable year 1941 in the amount of $5,450.16. With respect to the interest of $1,308.04, this Court is without jurisdiction to find an overpayment. See *Capital Building & Loan Association*, 23 B. T. A. 848; *Commissioner* v. *Kilpatrick's Estate*, 140 Fed. (2d) 889.

Reviewed by the Court.

> *Decision of no transferee liability will be entered in all dockets except Docket No. 9212. Decision that there is an overpayment in the amount of $5,450.16 will be entered in Docket No. 9212.*

DISNEY, *J.*, dissenting: It seems to me that the majority opinion rests upon the idea that the original stockholders had not attempted to sell the property. But be that as it may, Samuel Biern, Jr., had a contract with West Virginia for sale of the properties to it from and after December 23. By virtue of his option he took conveyance of the stock on December 29. He was then elected secretary, the assets were distributed to him in liquidation, and on the same day he sold to the State of West Virginia. An officer or a director of a corporation occupies a fiduciary or quasi-fiduciary relationship to it. 19 C. J. S. pp. 103–107. Under that relationship an officer can not assume positions in conflict with the interests of the corporation. *Burnes National Bank* v. *Mueller-Keller Candy Co.*, 86 Fed. (2d) 252. Moreover, it seems to me that as the sole owner of the stock Samuel Biern, Jr., was, in effect, a director and thus occupied a fiduciary relationship not only as an officer, but as a director, with relation to the corporation. He could make no profit from dealings with corporate property. The meaning of this fiduciary relationship need not be more particularly examined. In my view such officer acted for and on behalf of his corporation in carrying out the contract and making the sale. If we view the matter from the standpoint of the syndicate, not only did they act through Samuel Biern, Jr., who held the stock, but Samuel Biern, Sr., who appears to have been the moving spirit of the matter, was a director in the corporation. Yet he arranged for the sale. I would hold that this one man corporation made the sale. I therefore dissent.