T.C. Memo. 2007-61


UNITED STATES TAX COURT


ESTATE OF FRANCES ELAINE FREEDMAN, DECEASED,
ROBIN ELAINE CARNETTE, PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6416-04.                    Filed March 19, 2007.


        In late 1999, D received stock in ECNC in exchange
for her interest in a business venture.  In January of
2000, D contributed the stock to a recently opened
joint brokerage account titled in her name and that of
her son.  Shares of ECNC were thereafter sold between
late January and early March of 2000, generating
substantial capital gains.

        <u>Held</u>:  D, and not her son, is considered under
State law to be the owner of all ECNC stock in the
joint account and is therefore taxable on the full
amount of the gain arising from its sale.


<u>Joe M. Gonzalez</u>, for petitioner.

<u>Michael A. Pesavento</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined a Federal income tax deficiency in the amount of $567,864 and a penalty pursuant to section 6662 of $113,572.80 with respect to the 2000 taxable year of Frances Elaine Freedman (decedent).[1]  After concessions, to be explained in greater detail below, the principal issue for decision is what portion of gain from certain stock sales is taxable to decedent in 2000.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.  Decedent was a resident of the State of Florida when she died testate in Sint Maarten (also referred to as St. Martin), Netherlands Antilles, on June 17, 2003.  Her estate was admitted to probate in the Circuit Court for Hernando County, Florida, and her daughter, Robin Elaine Carnette (Ms. Carnette), was appointed personal representative.  The instant tax case was subsequently filed on behalf of the Estate of Frances Elaine Freedman (the estate), at which time Ms. Carnette resided in Brunswick, Georgia.

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended and in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

Family Background

Decedent was born on June 2, 1933. Her formal education ended upon dropping out of high school during eleventh grade. She thereafter married and divorced several times. Among her children were half-siblings Ms. Carnette and Ernest Greene (Mr. Greene), born in or about 1961 and 1964, respectively.

eConnect Stock and Proceeds

At some time prior to September of 1999, decedent and her then companion, Peter Pajarinin (Mr. Pajarinin), became involved in owning and operating an Internet casino in Costa Rica. On September 8, 1999, decedent and Mr. Pajarinin sold their interests in the venture and as part of the transaction each received 525,000 shares of stock in eConnect, the acquiring entity. The stock at that time was considered a "penny stock", trading over the counter with the ticker symbol ECNC at under 30 cents per share.

On or about January 7, 2000, a joint account was opened in the names of "Frances Elaine Freedman & Ernest Greene" with the brokerage firm of Valdes & Moreno, Inc. (Valdes & Moreno). Valdes & Moreno served as the "introducing broker" for the account, which account in turn was carried and cleared under an agreement with the investment banking firm First Southwest Company. The opening of this account was documented by, among other things, a customer agreement, a joint account agreement,

and a margin and short agreement. These documents set forth information concerning the account as well as its governing terms and conditions. The customer agreement designated the type of account as "JTWROS", and the joint account agreement reflected a similar designation creating an account "as joint tenants with rights of survivorship and not as tenants in common", whereby in the event of death of one of the parties thereto, the "entire interest" in the account would be vested in the survivor(s).

The agreements further made explicit that with respect to joint accounts, all authority, obligations, and liability of the tenants thereunder were joint and several. Any tenant could give binding instructions with respect to assets in the account, including buying, selling, or requesting distributions, and First Southwest Company was entitled to rely on such instructions from any tenant without further investigation. The agreements were also covered by an express choice of law clause, to wit:

> This Agreement and its enforcement shall be governed by the laws of the state of Texas and shall cover individually and collectively all accounts which the undersigned has previously opened, now has open or may open or reopen with FSWC, FSWC'S predecessor or any introducing broker, and any and all previous, current and future transactions in such accounts. * * *

Marco Listrom (Mr. Listrom) was the Valdes & Moreno broker overseeing the account. Decedent contacted him in late 1999 seeking a broker to assist her in selling the recently acquired eConnect stock. The account was funded on or about January 11,

2000, through decedent's signing over of the certificate for her 525,000 shares of eConnect to First Southwest Company for transfer into the account. The value of the stock at that juncture still did not exceed approximately 25 to 50 cents per share. Mr. Greene contributed no property or funds to the account at its inception or at any time thereafter.

The customer agreement used to open the account contained a number of blanks to be completed with information pertaining to the client, including Social Security number, address, telephone number, date of birth, marital status, employer, bank reference, etc. Decedent's personal data was used to complete each such field. The form also noted an approximate net worth of $50,000 and an absence of previous investment experience. The space for initial transaction was marked "SELL" "ECNC".

At some point after the account was established, decedent expressed to Mr. Greene that she was interested in selling the eConnect stock if it reached 50 cents per share. Mr. Greene then decided to conduct some online research into the company and product underlying the stock. He advised his mother that he thought, based on the eConnect technology, that the shares had the possibility of rising beyond her intended target and should be held longer. As the stock later began to appreciate, Mr. Greene participated in the excitement, tracking the rising price online and communicating with decedent.

Between January 24 and March 8, 2000, decedent placed sell orders with Valdes & Moreno that resulted in the following sales of eConnect shares:

| Date | Shares Sold | Share Price | Net Proceeds |
|------|-------------|-------------|--------------|
| 1/24/00 | 25,000 | $1.50 | $36,746.75 |
| 1/24/00 | 20,000 | 1.50 | 29,397.00 |
| 3/07/00 | 60,000 | 10.56 | 629,976.88 |
| 3/08/00 | 152,500 | 15.00 | 2,278,271.75 |

In total, 257,500 shares were sold during this period for net proceeds, after commissions, of $2,974,392.38.

After each of the foregoing sales, decedent submitted to First Southwest Company a request for transfer of funds.  On January 24, 2000, she requested a wire transfer of $30,000 for the benefit of R.V. World Hudson, Inc., which she used to purchase a motor home for herself.  Two wire transfer requests were placed on January 25, 2000, one directing $9,000 to a bank in Virginia for the benefit of Ms. Carnette and Ms. Carnette's husband, and the other directing $27,000 to a bank in Costa Rica for decedent's own benefit.  Likewise, on March 16, 2000, decedent requested a wire transfer to AmSouth Bank in Hudson, Florida, for her own benefit, which transfer was completed on the same date in the amount of $2,909,593.56.  The latter transaction removed from the Valdes & Moreno account the entire cash balance and left only the remaining 267,500 shares of eConnect.

The day after the March 8, 2000, sale of eConnect, the Securities and Exchange Commission apparently froze all trading

in the stock. By March 31, 2000, the value had fallen to $1.47 per share and was still dropping. It continued falling and never recovered any significant value during the period that shares remained in the Valdes & Moreno account. Over the next few years, decedent used the Valdes & Moreno account for occasional trading activity of modest value. Decedent wrote personal checks to facilitate such purchases from accounts at Wells Fargo. Although the record does not permit any direct tracing of funds, as no underlying documentation with respect to any Wells Fargo account was introduced, the evidence supports that some portion of the proceeds from the eConnect sales was eventually transferred to an account or accounts at Wells Fargo entities and that such accounts were in decedent's name alone. The balance of the cash generated by the limited trading activity taking place after the 2000 eConnect sales was eventually distributed at decedent's request. First Southwest Company on April 29, 2003, issued a check to decedent and Mr. Greene as joint tenants, using decedent's Florida address, in the amount of $4,584.05.

During 1999 and early 2000, decedent maintained her permanent residence in Hudson, Florida, but lived for extended periods in Costa Rica. Mr. Greene during early 2000 lived in an apartment in Burbank, California. Ms. Carnette moved from Woodbridge, Virginia, to Brunswick, Georgia, at some point during 2000. Following the eConnect sales and transfer of funds from

the Valdes & Moreno account, decedent became interested in moving to California.  Mr. Greene assisted in the search for property, and between late March and early May of 2000, a residence located at 61 Mollison Drive in Simi Valley, California, was selected and purchased for approximately $645,000.  Decedent paid for the home in cash principally by means of wire transfer from one or more of the accounts into which she had placed funds originating from the eConnect sales.

During the process of buying the property in California, decedent proposed that Mr. Greene reside with her in the Simi Valley home, apparently in part to facilitate efforts by Mr. Greene to start his own small business in the software development field.  Deed to the property was taken in the names "ERNEST GREENE, a Single Man and FRANCES ELAINE FREEDMAN, an Unmarried Woman as Joint Tenants".  Likewise, escrow documents and a buyer walk-through inspection form reflected both Mr. Greene and decedent as buyers.

Decedent and Mr. Greene lived together until early 2002, when decedent moved back to Florida and the Simi Valley home was sold.  Prior to that sale, Mr. Greene executed a quitclaim deed to decedent of any interest he held in the property, and decedent gave him $10,000 to help defray costs of relocation.  While they were residing together, decedent also contributed an amount between $25,000 and $50,000 to Mr. Greene's business venture, and

two 2000 Nissan Xterras were purchased, one for decedent and the other for Mr. Greene.  Decedent paid property taxes and insurance costs associated with the Simi Valley property.  Mr. Greene did not pay rent but contributed towards general maintenance expenses.

Ms. Carnette came to California in March of 2002 and assisted decedent in moving back to Florida.  After returning, decedent purchased a house at 24140 Powell Road in Brooksville, Florida, which served as her principal residence until her death.  Decedent also acquired property, apparently indirectly through a corporation, in Sint Maarten, Netherlands Antilles.

Tax Reporting and Examination

First Southwest Company issued a "2000 COMPOSITE STATEMENT OF 1099 FORMS" with respect to the Valdes & Moreno account.  The document was issued to "FRANCES ELAINE FREEDMAN & ERNEST GREENE JTWROS" at the Simi Valley address and reflected decedent's Social Security number.  It showed interest of $1,261.18 and total gross proceeds less commissions from the eConnect sales of $2,974,392.38.

In March of 2001, James E. Gill (Mr. Gill), a certified public accountant in California, met with decedent and Mr. Greene regarding preparation of decedent's personal income tax return for 2000.  Using information supplied by decedent and/or Mr. Greene, Mr. Gill completed decedent's Form 1040, U.S. Individual

Income Tax Return, for 2000. The return was signed by decedent and Mr. Gill on April 11, 2001, and filed with the Internal Revenue Service (IRS). The Form 1040 was accompanied by a Schedule D, Capital Gains and Losses, that reflected the sale of 257,500 shares of eConnect, with an acquisition date of September 8, 1998, a basis of zero, and resultant long-term capital gain of $2,974,393. The return also reported interest and dividend income received with respect to various financial accounts, including accounts at AmSouth, Dean Witter Reynolds, Fiserv, Valdes & Moreno, and Wells Fargo. Decedent did not file a gift tax return for 1999, 2000, 2001, 2002, or 2003.

Mr. Greene filed a Form 1040 for 2000 prepared by an individual not associated with Mr. Gill's firm. The return reported no capital gain or loss and no interest or dividends. Mr. Greene's return was subsequently selected for examination by the IRS, but the audit in mid-2002 yielded no recommended changes.

By early 2003, decedent's 2000 income tax return was likewise under examination. In April of 2003, decedent executed a Form 2848, Power of Attorney and Declaration of Representative, authorizing Mr. Gill to represent her in connection with the 2000 audit. Following decedent's intervening death on June 17, 2003, Mr. Gill continued review of the 2000 return and obtained additional documentation from the estate. That review led him to

conclude that the 2000 reporting should be altered in two respects. First, having learned that the eConnect stock was acquired in 1999, rather than 1998, Mr. Gill realized that the gain generated upon disposition was short term in nature. Second, based upon the fact that the Valdes & Moreno account was jointly held by decedent and Mr. Greene, Mr. Gill was of the opinion that the gain should have been split evenly between the two joint tenants.

The IRS disagreed that the gain was so divisible and on January 15, 2004, issued to decedent a notice of deficiency determining the aforementioned deficiency and accuracy-related penalty. The notice reflected two adjustments: Interest income was increased by $975 reported to the IRS by Wells Fargo Bank, and the eConnect sales were reclassified as resulting in short-term capital gain.

Shortly thereafter, the estate submitted to the IRS a Form 1040X, Amended U.S. Individual Income Tax Return, on behalf of decedent for the year 2000. Mr. Gill prepared the amended return incorporating only one-half of the proceeds from the eConnect sales but treating the concomitant capital gains as short term. The net effect was a decrease in total tax of $21,451, for which the estate requested a refund. The amended return was received by the IRS on February 9, 2004, but was not processed. A notice

of claim disallowance was also sent denying the $21,451 refund in full.

Death and Probate Proceedings

Approximately 2 weeks prior to her June 17, 2003, death, decedent had telephoned Ms. Carnette and asked her to come to Sint Maarten, where decedent was in the hospital. Ms. Carnette did so and was with decedent until her death. During that period, on June 16, 2003, decedent executed a will appointing Ms. Carnette as sole heiress, executrix, and administrator of decedent's estate.

The just-mentioned will was admitted to probate in the Circuit Court for Hernando County, Florida, and Ms. Carnette was appointed personal representative in late 2003. Her petition for administration contained a listing of estate assets that included, among other items, the Brooksville, Florida, property ($425,000); a 2000 Nissan ($8,000); a 1988 Holiday Rambler travel trailer ($18,000); bank accounts at SunTrust ($82,461); and portfolio accounts at Wells Fargo ($431,587.75) and Valdes & Moreno ($2,286.50). Mr. Greene then filed suit in the Superior Court for Los Angeles County, California, in early 2004, contending that decedent's property should pass in accordance with a pourover will and trust executed by decedent in California on July 7, 2000, that purportedly left all assets to Mr. Greene.

Contentious litigation between the siblings over decedent's
estate ensued and remained unresolved as of at least mid-2006.

Tax Court Proceedings

A timely petition disputing the notice of deficiency was
filed with this Court on April 14, 2004.  Both in the petition
and in subsequent stipulations the estate has conceded:  (1) That
an additional $975 of interest income was received by decedent in
2000 but not reported on her original return, and (2) that the
sales of eConnect shares during 2000 did not qualify for long-
term capital gain treatment.  Following a 2-day trial in November
of 2005, the parties filed posttrial briefs.  Respondent on
opening brief conceded the accuracy-related penalty under section
6662(a) asserted in the notice of deficiency.  Accordingly, none
of the specific adjustments made in the notice of deficiency
remain in dispute.  The estate, however, continues to propound
the argument first raised during the audit that the estate is
entitled to report only one-half of the capital gain generated by
the eConnect sales and, correspondingly, to receive a refund in
the approximate amount of $21,000.[2]

Simultaneously with the filing of its reply brief on
June 8, 2006, the estate filed a motion to reopen the record for

---

[2] The Court notes that to the extent that the petition seeks
reasonable administrative and/or litigation costs pursuant to
sec. 7430, any such claim is premature and will not be further
addressed.  See Rule 231.

receipt of two additional exhibits.  Respondent thereafter filed an objection to the motion.

OPINION

I.  General Rules

   A.  Federal Taxation Principles

The Internal Revenue Code imposes a Federal tax on the taxable income of every individual.  Sec. 1.  Section 61(a) specifies that gross income for purposes of calculating such taxable income means "all income from whatever source derived".  Encompassed within this broad pronouncement are all "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  More particularly, gains derived from dealings in property, interest, and dividends are expressly enumerated as falling under the purview of section 61(a).  Sec. 61(a)(3), (4), (7).

As a corollary, it is blackletter law that gains derived from property are taxable to the owner of the property.  See, e.g., Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Salvatore v. Commissioner, 434 F.2d 600, 601-602 (2d Cir. 1970), affg. T.C. Memo. 1970-30; Waltham Netoco Theatres, Inc. v. Commissioner, 401 F.2d 333, 334-335 (1st Cir. 1968), affg. 49 T.C. 399 (1968); Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 212-213 (1998); Steubenville Bridge Co. v. Commissioner, 11

T.C. 789, 798 (1948).  Property ownership, in turn, is determined by State law, consistent with the overarching principle that State law creates legal rights and property interests while Federal law determines how the rights and interests so created shall be taxed.  Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940).

    B.  State Law Regarding Joint Accounts

The parties to the instant litigation do not dispute that the relevant State law for purposes of this case is that of Texas.  In 1979, Texas adopted provisions derived from article VI of the Uniform Probate Code governing multiple-party accounts, codified at Tex. Prob. Code Ann. secs. 436-449 (Vernon 2003).  See Stauffer v. Henderson, 801 S.W.2d 858, 862-863 (Tex. 1990).  As pertinent here, Tex. Prob. Code Ann. sec. 436 defines "Multiple-party account" to include "a joint account" and "Joint account" to mean "an account payable on request to one or more of two or more parties whether or not there is a right of survivorship."  Accounts at brokerage firms are expressly placed within the scope of the statutory scheme.  Id.  Tex. Prob. Code Ann. sec. 437 then clarifies the reach of the ensuing provisions, as follows:

    Sec. 437.  Ownership as Between Parties and Others

        The provisions of Sections 438 through 440 of this code that concern beneficial ownership as between parties * * * of multiple-party accounts, are relevant only to controversies between these persons and their

creditors and other successors, and have no bearing on the power of withdrawal of these persons as determined by the terms of account contracts.

Next, the just-referenced Tex. Prob. Code Ann. sec. 438, entitled "Ownership During Lifetime", directs in subsection (a) (hereinafter TPC 438(a)) thereof: "A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent". Finally, Tex. Prob. Code Ann. sec. 439 completes the general structure, governing rights of survivorship and disposition of sums remaining on deposit at the death of a party to a joint account.

## II. Analysis

Given the foregoing backdrop, the outcome of the instant litigation turns largely upon application of TPC 438(a). The documentation with respect to the Valdes & Moreno account establishes its status as a joint account at a financial institution within the meaning of the Texas Probate Code. Moreover, the instant litigation is concerned with ownership as between the parties of this multiple-party account in the context of a controversy between one of these parties and a creditor, namely the IRS. That is precisely the type of situation that Tex. Prob. Code Ann. sec. 437 specifies is governed by TPC 438(a) and following provisions. Respondent and the estate, however,

have very different views as to the result that should obtain from applying TPC 438(a) here.

It is respondent's position that the record in this case establishes both that decedent contributed all the property placed in the Valdes & Moreno account and that she did not intend at the time she opened and funded the account to make a gift of eConnect stock to Mr. Greene. The estate, in contrast, while not disputing the applicability of TPC 438(a),[3] argues that decedent clearly intended to effect a gift of one-half of the eConnect stock to Mr. Greene by placing it in the joint account. The estate also points to a presumption in Texas common law that a parent intends to make a gift to a child upon delivering possession, conveying title, or purchasing property in the name of the child.

As previously quoted, TPC 438(a) legislates ownership of joint accounts during life in proportion to respective contributions, absent clear and convincing proof of a contrary intent. The evidence here is unequivocal in showing that all of the eConnect stock funding the Valdes & Moreno account was contributed by decedent and that Mr. Greene at no time placed any of his personal assets in the account. Hence, the focus of this

---

[3] Although the estate failed to cite or mention TPC 438(a) on opening brief, the estate's reply brief and subsequent motion to reopen the record quote and discuss the statute in a manner presumptive of its applicability and never so much as allege that TPC 438(a) is not operative here.

case can be narrowed particularly to application of the "different intent" exception.

In construing provisions of the Texas Probate Code derived from the Uniform Probate Code, Texas courts have looked to corresponding provisions in the uniform act, considering the degree of textual similarity and taking guidance from the comments accompanying the uniform laws.  See, e.g., Stegall v. Oadra, 868 S.W.2d 290, 293 (Tex. 1993); Stauffer v. Henderson, supra at 863; Dickerson v. Brooks, 727 S.W.2d 652, 654 (Tex. App. 1987).  The language of TPC 438(a) is identical to that of Unif. Probate Code sec. 6-103(a) (1969 Act), 8 U.L.A. (Part II) 464 (1998), the attendant comment of which reads in relevant part:

> This section reflects the assumption that a person who deposits funds in a multiple-party account normally does not intend to make an irrevocable gift of all or any part of the funds represented by the deposit. Rather, he usually intends no present change of beneficial ownership.  The assumption may be disproved by proof that a gift was intended. * * * It is important to note that the section is limited to describe ownership of an account while original parties are alive.  Section 6-104 prescribes what happens to beneficial ownership on the death of a party.  The section does not undertake to describe the situation between parties if one withdraws more than he is then entitled to as against the other party.  Sections 6-108 and 6-112 protect a financial institution in such circumstances without reference to whether a withdrawing party may be entitled to less than he withdraws as against another party.  Presumably, overwithdrawal leaves the party making the excessive withdrawal liable to the beneficial owner as a debtor or trustee.  Of course, evidence of intention by one to make a gift to the other of any sums withdrawn by the other in excess of his ownership should be effective.

The final Code contains no provision dealing with division of the account when the parties fail to prove net contributions. The omission is deliberate. Undoubtedly a court would divide the account equally among the parties to the extent that net contributions cannot be proven; but a statutory section explicitly embodying the rule might undesirably narrow the possibility of proof of partial contributions and might suggest that gift tax consequences applicable to creation of a joint tenancy should attach to a joint account. The theory of these sections is that the basic relationship of the parties is that of individual ownership of values attributable to their respective deposits and withdrawals; * * *

The just-quoted comment elucidates that the "different intent" contemplated by the exception contained in TPC 438(a) is an intent to make a gift. Stated otherwise then, the necessary showing required to override the rule of ownership in proportion to contributions is clear and convincing proof that a gift was intended. Moreover, the comment drives home that since the opening of a joint account and the depositing of assets therein are inherent in any scenario covered by the statute, these facts play no role in establishing the requisite intent to meet the exception.

Under Texas law, clear and convincing evidence demands "'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" In re G.M., 596 S.W.2d 846, 847 (Tex. 1980) (quoting State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979)); see also Oadra v. Stegall, 871 S.W.2d 882, 891 (Tex. App. 1994). This burden falls on the party

claiming that a gift has been made.[4]  Oadra v. Stegall, supra at 891.  Extrinsic or parol evidence is typically inadmissable to prove the nature of an account for purposes of the Texas Probate Code but is not proscribed on questions of the ownership and capacities of parties to such an account.  Stegall v. Oadra, supra at 294; Oadra v. Stegall, supra at 894.

Texas courts adhere to a requirement of three elements as necessary to establish the existence of a gift:  (1) Intent to make a gift; (2) delivery of the property; and (3) acceptance of the property.  Dorman v. Arnold, 932 S.W.2d 225, 227 (Tex. App. 1996); Grimsley v. Grimsley, 632 S.W.2d 174, 177 (Tex. App. 1982).  Given that these requirements are stated in the conjunctive and that the emphasis of TPC 438(a) is on the issue of intent, focus at the outset on the first-listed element is appropriate here.

The estate cites a litany of circumstances in an effort to show that decedent intended by placing her eConnect stock in the joint account to make a gift to Mr. Greene.[5]  This alleged

---

[4] The State law rules on placement of burden relevant in this case dovetail with the typical rule in tax litigation that the burden of proof rests on the taxpayer generally and on the party raising any new matter particularly.  See Rule 142(a). Although sec. 7491(a) can effect a shift of burden in specified circumstances, the estate makes no argument that the statute has any application here and has not addressed the preconditions for its use.

[5] The estate also directs the Court's attention to a number
(continued...)

evidence can be grouped roughly into five general categories. The first incorporates documents involved in the opening and routine administration of the Valdes & Moreno account. For example, the estate notes the assignment of the eConnect stock certificate to First Southwest Company, the Valdes & Moreno customer agreement, the joint account agreement, the margin and short agreement, the monthly account statements, the sale confirmation statements, the composite Form 1099, and the check issued in 2003 by First Southwest Company of the remaining cash balance in the Valdes & Moreno account. The estate alleges that these documents are probative in that they reflect the names of both decedent and Mr. Greene as parties to the account and/or by their terms afford to decedent and Mr. Greene equal rights and authority to deal with the account.

---

[5](...continued)
of Texas cases, the majority of which: (1) Construe State law prior to enactment of the current Texas Probate Code; (2) deal more generally with gift issues outside the specialized context of the operative joint account rubric; and/or (3) pertain to issues of ownership in controversies between parties to joint accounts, a matter expressly not covered by TPC 438(a) and related provisions, rather than ownership in controversies vis-a-vis creditors. The bulk of this material is not germane to the Court's disposition here, or at best marginally relevant and cumulative, and will not be further addressed. As noted by the Supreme Court of Texas in an opinion construing the related provision of Tex. Prob. Code Ann. sec. 439 (Vernon 2003), enactment of the Texas Probate Code served to replace "the various legal theories" which had been used in analyzing joint account matters and were "difficult to reconcile". Stauffer v. Henderson, 801 S.W.2d 858, 862-863 (Tex. 1990).

Undoubtedly, the foregoing evidence and like documentation might be highly probative were the aim to establish existence of a joint account. That point, however, is undisputed. The instant inquiry is already taking place under the rubric of TPC 438(a). Because that provision operates solely in the context of joint accounts, documentation showing accounts titled in the names of multiple parties and conferring on them contractual rights vis-a-vis a financial institution is presumed and inherent in all cases. Accordingly, the clear and convincing evidence referenced in the exception must demand something more. The estate's reliance on materials of this nature is therefore misplaced and carries little, if any, weight in establishing decedent's intent to make a gift. In fact, the exclusive use of decedent's personal information in filling out the customer agreement could cut the other way.

The second general category of circumstances pressed by the estate relates to Mr. Greene's claimed management of and control over the Valdes & Moreno account. The estate mentions that Mr. Greene conducted "due diligence" with respect to the eConnect shares, attended eConnect shareholder meetings, consulted and jointly made decisions with decedent regarding the account, recommended when to sell the eConnect stock, shared in the excitement of the rising price and sale, opened mail related to the account, was the subject of purported comments by decedent

referring to the money as theirs, and later handled liquidation of the account by "initiat[ing] the movement of the money from Valdes & Moreno, Inc. to Wells Fargo where the money still is, via some mere stops along the way at some Florida banks."

Attempted review of these alleged circumstances, however, highlights a key problem with the record in this case. The noted details are drawn largely from uncorroborated testimony of Mr. Greene, whose testimony in general the Court finds to be singularly lacking in credibility. We have before us testimony by Mr. Greene taken in three contexts; i.e., his deposition from October of 2004 in the Florida probate litigation, his statements on direct examination at the trial of this Tax Court case as a witness for respondent, and his responses on cross-examination by counsel for the estate. Comparison reveals that Mr. Greene's overall position in the probate litigation is essentially the opposite of his stance as a witness for respondent.

His deposition testimony is geared towards emphasizing his involvement in all that relates to the eConnect shares, so as to challenge the will being probated and to establish an interest in decedent's property. In this Court, his comments are shaded towards distancing himself from any interest in the stock and concomitant taxable gain. The result is two inconsistent presentations, with the intersection between the two represented by unconvincing attempts on cross-examination to explain apparent

contradictions. The Court therefore is unable to rely on much of Mr. Greene's testimony, particularly when it comes to his management of or control over the stock sales and Valdes & Moreno account, where some of the most marked discrepancies arise.

Thus, while statements by Mr. Greene might be sufficient to show that he assisted decedent by researching, tracking, and making recommendations about the eConnect shares, his comments fall short of establishing any genuine management and control. Furthermore, the documentary record supports that any time an actual sales call or request to transfer funds was made, it was decedent's personal action that formally initiated the transaction. Shared excitement and casual use of plural pronouns are hardly a substitute for the complete dearth of documentary evidence to show Mr. Greene making even one order with respect to the account. Notably, the estate tries to minimize the significance of decedent's prompt transfer of the sales receipts out of the Valdes & Moreno account by claiming that Mr. Greene "initiated the movement". Suffice it to say that the attempt, conclusory, self-serving, and unsupported, fails to blunt one of the key objective facts in this litigation--that shortly after the eConnect sales, decedent ordered Valdes & Moreno to transfer the proceeds to other accounts that the record indicates were in her name alone.

The third category of circumstances cited by the estate pertains to alleged evidence that Mr. Greene "benefited substantially" from the eConnect transactions. Included in this category are the joint purchase and rent-free occupation of the Simi Valley home, as well as Mr. Greene's receipt of: (i) $30,000 for his business; (ii) a Nissan Xterra; and (iii) $10,000 for later relocation from the Simi Valley home. Again, however, much of this claimed evidence is testimonial and suffers from the same shortcomings just discussed.

Mr. Greene's statements concerning his role in the negotiations on the house and the acquisition of the Xterra are particularly nebulous and fraught with inconsistencies, and his eventual execution of a quitclaim deed for the house undercuts any understanding between those involved of a true and intended ownership interest. Regardless, the salient feature is that all of these transactions occurred after decedent transferred the eConnect proceeds out of the Valdes & Moreno account into other accounts of her own. At most the benefits portray an intent to share her wealth by giving specific, limited gifts to her son at times subsequent to the eConnect windfall. They do not reflect a scenario where ownership of half the wealth by Mr. Greene was a fait accompli because she had previously given him the underlying stock before it was sold.

The fourth category of circumstances raised by the estate pertains to the events and documents that are the subject of the estate's motion to reopen the record. The estate asks the Court to permit submission of three additional documents, incorporated into two exhibits: (1) Exhibit 46-P, copies of decedent's purported July 7, 2000, pourover will and family trust; and (2) Exhibit 47-P, a copy of a motion for partial summary judgment filed by Mr. Greene in the Florida probate litigation.

Reopening the record for the submission of additional evidence is a matter within the discretion of the trial court. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); Butler v. Commissioner, 114 T.C. 276, 286-287 (2000). The standard for doing so may be summarized as follows: "A court will not grant a motion to reopen the record unless, among other requirements, the evidence relied on is not merely cumulative or impeaching, the evidence is material to the issues involved, and the evidence probably would change the outcome of the case." Butler v. Commissioner, supra at 287.

The items proffered in the estate's motion to reopen the record fall short of the foregoing standard. Even if admitted, the documents would not alter the outcome in this case. The estate contends that the pourover will and family trust show decedent's "donative intent that Mr. Greene own one-half of all that she had in 2000, the year of the subject sale which produced

the taxable gain in this case." These documents, however, actually weigh against the estate's position here. Critically, they were executed after decedent had transferred the overwhelming majority of the eConnect sales proceeds to other accounts owned individually by her, including apparently various accounts at Wells Fargo. A number of accounts at Wells Fargo and Dean Witter are among the assets listed on the schedule of property placed in the trust, as is the Simi Valley residence. Terms of the trust, which is revocable by decedent, operate to apply the property for decedent's benefit during life and to distribute the assets to Mr. Greene only upon her death.

Consequently, as of July of 2000, decedent was behaving as if the property generated by the eConnect sales was still under her control and hers to give away at her death, not as if half was already owned by Mr. Greene. Such would seem to belie an intent to gift the underlying stock upon funding of the Valdes & Moreno account in January of 2000. The motion for summary judgment, which seeks a ruling based on the alleged validity of the pourover will and trust, is no more helpful to the estate and is even less probative, a mere litigating position in another proceeding. The admission of these materials would therefore do little, if anything, to provide support for the stance taken by the estate here.

Furthermore, even if the documents buttressed the estate's argument, denial of their admission would be appropriate on grounds of prejudice to respondent. By submitting the documents after trial, the estate deprived respondent of any opportunity to examine or question them during the proceeding. In fact, the items were not proffered until after respondent had filed both opening and reply briefs. Furthermore, it is clear from the record that the will and trust documents were available to the estate at least a year prior to trial in the instant case. The estate offers no explanation or excuse as to why the materials could not have been exchanged and dealt with in accordance with the procedures set forth in Rule 91 and the Court's standing pretrial order. We normally do not countenance such tardiness. The Court will deny the estate's motion to reopen.

The fifth category drawn upon by estate is the familial relationship between decedent and Mr. Greene and the presumption related thereto under Texas law. As stated in the following oft-cited pronouncement, Texas courts adhere to a rule under which: "There is, however, a presumption that a parent intends to make a gift to his child if the parent delivers possession, conveys title, or purchases property in the name of a child." Woodworth v. Cortez, 660 S.W.2d 561, 564 (Tex. App. 1983); see also Richardson v. Laney, 911 S.W.2d 489, 492 (Tex. App. 1995); Oadra v. Stegall, 871 S.W.2d at 891; Masterson v. Hogue, 842 S.W.2d

696, 697 (Tex. App. 1992).  The presumption is rebuttable by clear and convincing evidence.  Richardson v. Laney, supra at 492; Masterson v. Hogue, supra at 697; Kyles v. Kyles, 832 S.W.2d 194, 197 (Tex. App. 1992).

Although research has not revealed any Texas cases directly addressing the propriety of using this presumption in the context of joint account matters controlled by TPC 438(a) and related provisions, the Court for the sake of argument will assume its potential applicability here.  Accordingly, we consider the sufficiency of the evidence offered by respondent to overcome any presumption of donative intent.

In contrast to the weak and suspect nature of the circumstances relied upon by the estate in an attempt to show donative intent, as discussed above, the more objective evidence in the record leans strongly in the opposite direction.  As alluded to previously, one of the most salient facts here is that within days of each relevant sale of eConnect shares, decedent wired the proceeds out of the joint account.  The March 16, 2000, transfer of $2,909,593.56 into a personal account at AmSouth Bank is particularly revealing.  Moreover, none of the investment accounts in which the proceeds subsequently came to rest is purported to be any type of joint account over which Mr. Greene possessed even formal authority.  Such actions are nearly impossible to reconcile with the idea of shares' having been

given to Mr. Greene 3 months earlier.  Again, the limited later gifts of comparatively small monetary amounts likewise belie a preceding gratuitous transfer of the underlying shares, as does the quitclaim deed of Mr. Greene's interest in the Simi Valley residence.

In addition to the positive inferences which may be drawn from the numerous instances in which decedent did act to exercise dominion over activity in the Valdes & Moreno account and the funds generated by the eConnect sales (i.e., as to all material transactions prior to her death, making all eConnect buy and sell calls to the broker, wiring the resultant funds, giving particular gifts to her children, etc.), negative inferences arise from the lack of any such activity on the part of Mr. Greene.  The record contains no specific evidence of any instance in which Mr. Greene exercised any formal authority over the contents of the joint account.  Even his testimony portrays a role only akin to that of an adviser.

Also highly probative is the contemporaneous tax reporting by both decedent and Mr. Greene.  Positions taken in a tax return may be treated as admissions and may be disavowed only by cogent proof that they are incorrect.  Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. T.C. Memo. 1968-126; Mendes v. Commissioner, 121 T.C. 308, 312 (2003); Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989).

On her original 2000 income tax return, decedent reported selling all 257,500 shares. She further did not file a gift tax return for 2000. Consistent with his mother's treatment, Mr. Greene did not report any sale of shares on his 2000 return. The change in position to that reflected in decedent's amended return transpired only after her death, at a time when she could no longer speak to her intentions regarding the eConnect stock and the Valdes & Moreno account. Decedent's own representations on a return she reviewed and signed are decidedly more persuasive than recharacterizations by others nearly 3 years later, not to mention after an IRS assertion of additional tax due.

Given the entire record in this case, the Court therefore concludes that the evidence is sufficient to rebut any presumption, arising due to a parent-child relationship, that a gift was intended. Hence, the circumstances cited by the estate, whether viewed individually or as a collective whole, fail to afford clear and convincing evidence of an intent to make a gift to Mr. Greene upon decedent's establishment and funding of the disputed joint account, as mandated by TPC 438(a). Consideration of the remaining elements of a gift, i.e., delivery and acceptance, is unnecessary. The general rule of TPC 438(a) thus applies to accord ownership of the eConnect stock in proportion to the respective contributions of the parties to the joint account. The result is that decedent owned all the shares at the

time of the sales underlying this litigation, and she alone is taxable on the gain generated thereby.

To reflect the foregoing and concessions made by the parties,

<u>An appropriate order and decision will be entered</u>.