# United States Tax Court

T.C. Memo. 2025-52

SOROBAN CAPITAL PARTNERS LP, SOROBAN CAPITAL
PARTNERS GP LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket Nos. 16217-22, 16218-22.             Filed May 28, 2025.

———————

*Elizabeth J. Smith*, *Kathleen S. Gregor*, *Caitlyn M. Otenti*, and *Armando Gomez*, for petitioner.

*Emerald G. Smith*, *Naseem Jehan Khan, Michael E. Washburn*, and *Jonathan E. Cornwell*, for respondent.

MEMORANDUM OPINION

BUCH, *Judge*: Soroban Capital Partners LP (Soroban) is a limited partnership with a general partner and three limited partners. When calculating net earnings from self-employment for 2016 and 2017 (years in issue), Soroban included guaranteed payments it had made to its limited partners but otherwise excluded their shares of partnership income. The Commissioner issued Notices of Final Partnership Administrative Adjustment (FPAAs) for the years in issue in which he increased Soroban's net earnings from self-employment.

Section 1402(a)(13)[1] excludes "income or loss of a limited partner, as such," when calculating net earnings from self-employment. We

———————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation

**[\*2]** previously held in *Soroban Capital Partners LP v. Commissioner*, 161 T.C. 310 (2023), that in determining the extent to which the limited partner exception of section 1402(a)(13) applies, we apply a functional analysis to determine the extent to which limited partners were acting as such. And in *Denham Capital Management LP v. Commissioner*, T.C. Memo. 2024-114, at \*14, we observed: "Our caselaw has continuously reinforced our position that determinations under section 1402(a)(13) require a factual inquiry into how the partnership generated the income in question and the partners' roles and responsibilities in doing so." That factual inquiry is now before us in these cases.

During the years in issue, Soroban earned income from managing investments. Soroban's limited partners played an essential role in generating this income. Soroban acknowledged that the limited partners' unique skills and experience were indispensable to the business. The limited partners exercised managerial control over Soroban and worked full time with Soroban. They contributed little to no capital relative to their shares of income. Functionally, Soroban's limited partners were not acting as limited partners.

### *Background*

The case was submitted for decision without trial pursuant to Rule 122.

### I.  *Soroban's Structure*

Soroban is a Delaware limited partnership that was classified as a partnership for federal income tax purposes for the years in issue.[2] At

---

references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and rounded to the nearest dollar.

[2] For the years in issue, Soroban is treated as a partnership subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71. In 2015, Congress enacted the Bipartisan Budget Act of 2015 (BBA), Pub. L. No. 114-74, 129 Stat. 584, which amended the Code by striking the TEFRA provisions and enacting new provisions using many of the same Code section numbers. BBA § 1101(a), (c)(1), 129 Stat. 584, 625. The BBA generally applies for taxable years beginning after December 31, 2017. *See* BBA § 1101(g)(1), 129 Stat. at 638. When referring to sections 6221–6255 in this Memorandum Opinion, we are referring to the TEFRA provisions in effect for the years in issue.

**[\*3]** the time of filing the Petitions underlying these cases, Soroban's principal place of business was in New York, New York.

For the years in issue, Soroban identified four partners on its Schedules K–1, Partner's Share of Income, Deductions, Credits, etc. Those partners were Soroban Capital Partners GP LLC (petitioner), EWM1 LLC, GKK LLC, and Scott Friedman.

### A.    *Soroban's General Partner*

Petitioner is Soroban Capital Partners GP LLC, a Delaware limited liability company and the only general partner of Soroban. As the only general partner of Soroban, petitioner is also the tax matters partner (TMP).[3] For the years in issue, petitioner was classified as a partnership for federal income tax purposes.

Petitioner in turn identified three members on its Schedules K–1. Those members were EWM1 LLC, GKK LLC, and Scott Friedman.

Under the "Limited Liability Company Agreement of Soroban Capital Partners GP LLC," Messrs. Mandelblatt and Kapadia had the power to manage petitioner.

### B.    *Soroban's Limited and Indirect Partners*

Soroban's limited partners were EWM1 LLC, GKK LLC, and Scott Friedman. EWM1 LLC and GKK LLC were single-member limited liability companies that were wholly owned by Eric Mandelblatt and Guarav Kapadia, respectively. Neither EWM1 LLC nor GKK LLC elected to be treated as an entity separate from its owner, and as a result, they were disregarded for federal income tax purposes. *See* Treas. Reg. §§ 301.7701-1(a)(4), 301.7701-3(b)(1)(ii). Interests held by EWM1 LLC and GKK LLC are treated as being held directly by Messrs. Mandelblatt and Kapadia, respectively.

Petitioner's members, who are indirect partners of Soroban, *see* I.R.C. § 6213(a)(10), likewise were EWM1 LLC, GKK LLC, and Scott Friedman. Thus, taking into account both direct and indirect interests,

---

[3] Both the 2016 and 2017 Forms 1065, U.S. Return of Partnership Income, purported to designate a limited partner as TMP, but a limited partner may not be designated as TMP if any general partner is eligible to serve as TMP. *See* I.R.C. § 6231(a)(7)(B). Further, the parties stipulated that petitioner is the TMP.

**[\*4]** Soroban was wholly owned by three individuals, Messrs. Mandelblatt, Kapadia, and Friedman (Principals).

C. *The Principals' Interests*

On its Form 1065, U.S. Return of Partnership Income, Soroban reported its partners owning the following interests[4] during 2016 and 2017:

|  | 2016 | | 2017 | |
|---|---|---|---|---|
| *Partner* | *Profit/Loss* | *Capital* | *Profit/Loss* | *Capital* |
| Petitioner | 1.00% | 2.69% | 1.00% | 0.75% |
| Mr. Mandelblatt | 56.37% | 58.31% | 55.59% | 57.65% |
| Mr. Kapadia | 36.36% | 33.06% | 37.15% | 35.44% |
| Mr. Friedman | 6.26% | 5.94% | 6.26% | 6.16% |
| **Total** | **100%** | **100%** | **100%** | **100%** |

Petitioner also reported similar ownership interests of its members.

|  | 2016 | | 2017 | |
|---|---|---|---|---|
| *Partner* | *Profit/Loss* | *Capital* | *Profit/Loss* | *Capital* |
| Mr. Mandelblatt | 56.99% | 56.73% | 56.21% | 55.96% |
| Mr. Kapadia | 36.69% | 36.95% | 37.47% | 37.72% |
| Mr. Friedman | 6.32% | 6.32% | 6.32% | 6.32% |
| **Total** | **100%** | **100%** | **100%** | **100%** |

D. *The Principals' Ordinary Income Allocations*

Soroban allocated ordinary income to each of its partners. That income was allocated as follows for the years in issue:

---

[4] For brevity, the following tables include the interests held at each year's end. All percentages are rounded to two decimal places; totals are calculated without regard to rounding.

[*5]

| Soroban's Ordinary Income Allocation | | |
|---|---|---|
| *Partner* | *2016* | *2017* |
| Petitioner | $785,335 | $645,965 |
| Mr. Mandelblatt | 44,223,468 | 35,861,128 |
| Mr. Kapadia | 28,526,812 | 23,963,504 |
| Mr. Friedman | 4,913,682 | 4,041,670 |
| **Total** | **$78,449,297** | **$64,512,267** |

As for the income allocated by Soroban to petitioner, Soroban reported it as self-employment earnings, and in turn, petitioner allocated the entire amount as ordinary income on the Schedules K–1 it issued to its members. That ordinary income was allocated as follows:

| Petitioner's Ordinary Income Allocation | | |
|---|---|---|
| *Member* | *2016* | *2017* |
| Mr. Mandelblatt | $447,552 | $363,084 |
| Mr. Kapadia | 288,150 | 242,056 |
| Mr. Friedman | 49,633 | 40,825 |
| **Total** | **$785,335** | **$645,965** |

Except for insignificant amounts reported as section 179 deductions, petitioner reported all of the income allocated to its members as net earnings from self-employment.

In contrast, when reporting the income allocated to its limited partners, Soroban characterized only the amount of the guaranteed payments as net earnings from self-employment. The guaranteed payments to limited partners (and thus the net earnings from self-employment) reported by Soroban were as follows:

| Guaranteed Payments/Net Earnings from Self-Employment | | |
|---|---|---|
| *Limited Partner* | *2016* | *2017* |
| Mr. Mandelblatt | $640,380 | $641,309 |
| Mr. Kapadia | 365,380 | 366,310 |
| Mr. Friedman | 246,624 | 247,552 |
| **Total** | **$1,252,384** | **$1,255,171** |

**[\*6]** As for how these amounts were determined, according to Soroban, its partners received as their compensation the "net incentive and management fees earned from the Funds."

II.     *Soroban's Operations*

Soroban earned its income from fees it charged its clients for managing investments. Soroban provided investment management services from which it derived all its gross receipts, sales, or other income during the years in issue.

Soroban managed 11 funds: (1) Soroban Master Fund LP (Master Fund), (2) Soroban Fund LLC, (3) Soroban Intermediate Fund LP, (4) Soroban Cayman Fund Ltd., (5) Soroban Opportunities Master Fund LP (Opportunities Fund), (6) Soroban Opportunities Fund LLC, (7) Soroban Opportunities Intermediate Fund LP, (8) Soroban Opportunities Cayman Fund Ltd., (9) Soroban Special Investment Master Fund SPC (Special Fund), (10) Soroban Special Investment Fund LLC, and (11) Soroban Special Investment Fund SPC.

Soroban grouped certain funds together. The Master Fund and the Opportunities Fund were grouped into "master-intermediate-feeder" sets of related funds. Soroban Fund LLC, Soroban Cayman Fund Ltd., and Soroban Intermediate Fund LP collected money from investors and then invested the assets, directly or indirectly, in the Master Fund. Additionally, Soroban Opportunities Fund LLC, Soroban Opportunities Cayman Fund Ltd., and Soroban Opportunities Intermediate Fund LP collected money from investors and invested these assets, directly or indirectly, in the Opportunities Fund. The Special Fund operated a "master-feeder" structure where the Soroban Special Investment Fund LLC and the Soroban Special Investment Cayman Fund LP, collected money from investors and then invested these assets in the Special Fund.

The funds compensated Soroban according to the value of the fund assets as well as their performance. The funds paid Soroban quarterly investment management fees in amounts equal to 0 to 1.5% of the values of the funds. Some funds also paid an affiliate of Soroban annual performance-based compensation, ranging from 17% to 35% of the capital appreciation of the fund assets. Any management fees based on the value of the fund assets were charged at the master fund level. Soroban could waive these fees at its discretion.

[*7]  For the years in issue, Soroban's gross income represented amounts paid by the Master Fund and the Opportunities Fund. In 2016, the Master Fund and the Opportunities Fund paid Soroban $88,509,662 and $27,910,903, respectively, totaling $116,420,565. In 2017, the Master Fund and the Opportunities Fund paid Soroban $93,078,116 and $37,916,496, respectively, totaling $130,994,612. The other funds did not pay Soroban fees in the years in issue.

The funds accounted for their payments to Soroban as expenses for management services. The Investment Management agreement between Soroban and the Master Fund, as well as that between Soroban and the Opportunities Fund, provides: "As consideration for the services rendered pursuant to this Agreement, the Investment Manager [Soroban] shall be entitled to receive the Management Fees described in the Offering Memoranda." The Master Fund and Opportunities Fund characterized the amounts they paid to Soroban as "Expenses" on their "Statement of Operations" for 2016.

Soroban advertised these arrangements to its potential clients. Soroban solicited potential investors for the Master Fund and the Opportunities Fund with descriptions of the features of the respective funds in Private Placement Memoranda. These Private Placement Memoranda described the fees paid by the investors to Soroban as "Management Fees."

A.  *Roles of the Principals in Investment Management*

Messrs. Mandelblatt, Kapadia, and Friedman managed both the investments and the operations of Soroban and the funds it managed.

In the years in issue, Mr. Mandelblatt was Soroban's managing partner and chief investment officer (CIO). During those years, his duties included managing the investing of the funds' portfolios on Soroban's behalf. Soroban described Mr. Mandelblatt as responsible for "portfolio management," "research," and "risk management." Mr. Mandelblatt had "final discretion on all portfolio-related matters."

In the years in issue, Mr. Kapadia was Soroban's comanaging partner. His duties included managing the investing of the funds' portfolios on Soroban's behalf. Soroban described him as responsible for "portfolio management," "research," and "risk management."

In the years in issue, Mr. Friedman was Soroban's head of trading and risk management. Mr. Friedman's duties included executing

[*8] Messrs. Mandelblatt's and Kapadia's investing decisions. Soroban described him as responsible for "risk management" and "trade execution."

### 1.    *Investment Advice*

All three Principals were responsible for daily "risk management oversight." To accomplish this, they used daily reports to monitor profit and loss exposures and to adjust the portfolios to stay within risk guidelines.

The Principals managed risk by monitoring and hedging transactions. Mr. Mandelblatt and Mr. Kapadia routinely "perform[ed] an extensive review of all analytical work including company fundamentals, industry analysis and market technicals [sic] in an effort to determine the risk associated with each trade and [would] determine the sizing, timing and hedging of each trade prior to entering into a trade." The Principals "hedge[d] the portfolio to control any unintended exposures" from stress testing. The Principals "perform[ed] a daily review of risk concentration in the portfolio."

The Principals managed trade orders. Soroban explained to its investors that Mr. Mandelblatt and Mr. Kapadia were responsible for authorizing trade orders, but that Mr. Mandelblatt had final veto power. Orders were provided to traders throughout the day by Mr. Mandelblatt or Mr. Kapadia. Mr. Friedman and others could execute trades and were always available to do so.

### 2.    *Managing Investment Personnel*

Messrs. Mandelblatt and Kapadia led the investment process. Soroban had an investment team during the years in issue, which consisted of the Principals plus research analysts and traders who reported to them.

### B.    *Roles of the Principals in Soroban's Operation*

### 1.    *Serving on Committees*

All three Principals served on all of the committees that oversaw the operations of Soroban. In 2016, Soroban had four committees that oversaw operations: Brokerage, Trade Allocation, Valuation, and Management. Each of the Principals served on all four of those committees. In 2017, Soroban added an additional committee for

**[*9]** Cybersecurity. The Cybersecurity Committee was the only committee on which the three Principals did not all serve.

The Brokerage Committee was Soroban's policy-making body with respect to the management of brokerage activities. During the years in issue, the Brokerage Committee reviewed a schedule of Soroban's executing brokers and the commissions paid to (and services received from) such brokers and revised the list of approved brokers on the basis of its assessment of various factors. The Brokerage Committee was to meet at least annually and generally quarterly. The Brokerage Committee approved and ratified all counterparties with whom Soroban traded.

The Trade Allocation Committee was responsible for ensuring that Soroban acted in accordance with Soroban's trade allocation policies and procedures, and it determined under which circumstances deviations from those policies were warranted. Their activities included aggregating investments for clients and allocating investments among clients. The Trade Allocation Committee generally met quarterly.

The Management Committee discussed and considered material issues affecting the firm.

The Valuation Committee was responsible for ensuring that Soroban complied with its valuation policies and procedures and that any good faith estimates of investments' fair value were made using reasonable and appropriate methods. The Valuation Committee was to meet quarterly.

2. *Control Over Hiring Decisions*

In general, Soroban's daily business operations were handled by employees other than the Principals. These employees included Vito Tanzi, chief operating officer (COO) and chief financial officer (CFO); Steven Johnson, head of investor relations; and Steven Niditch, general counsel and chief compliance officer. Soroban's daily business operations were "functions that did not involve managing its advised investment funds' investments, exposures and risks." Twelve to fourteen people assisted Messrs. Tanzi, Johnson, and Niditch in these roles.

The Principals nonetheless exercised control over the daily business operations, including hiring and firing. Messrs. Tanzi, Johnson, and Niditch reported to Messrs. Mandelblatt and Kapadia. Soroban's practice was for all partners and employees to interview all

**[*10]** hiring candidates. The Principals were involved in decisions to fire, promote, terminate, and evaluate Soroban's employees in 2016 and 2017. Thus, although daily business operations were handled by employees other than the Principals, those employees were subject to the hiring and firing decisions of the Principals.

###### 3. *Ability to Bind the Partnership*

In the years in issue, Mr. Mandelblatt could execute agreements, contracts, or other documents binding Soroban in his capacity as Managing Partner of Soroban's general partner. Mr. Mandelblatt could sign OTC derivative master agreements and confirmations and modifications to such agreements.

Other employees could also bind the partnership. Messrs. Tanzi and Niditch (subordinates to Mr. Mandelblatt) could execute agreements, contracts, and other documents in their respective capacities as COO/CFO and general counsel/chief compliance officer.

Soroban's limited partnership agreement provided that only petitioner, as the general partner of Soroban, would be able to bind or manage Soroban. In turn, the partners of petitioner were the three Principals. Mr. Mandelblatt and Mr. Kapadia were petitioner's managing and comanaging partner, respectively. Mr. Kapadia, as comanaging partner, could act on behalf of petitioner with respect to all aspects of the business, subject only to Mr. Mandelblatt's ultimate authority. Mr. Kapadia would use "reasonable efforts" to consult with Mr. Mandelblatt on matters falling outside of day-to-day activities. Mr. Mandelblatt could overrule Mr. Kapadia.

##### C. *Principals' Time Commitment*

All three Principals treated Soroban as their full-time jobs. While Soroban did not create or maintain formal records or timesheets documenting the hours worked by the Principals, it estimated that the Principals worked between 2,300 and 2,500 hours per year during the years in issue.

The Principals were required to devote their full attention to the business. Messrs. Mandelblatt and Kapadia were required under the terms of Soroban's limited partnership agreement to devote their "full time" to Soroban's investment management business and were generally prohibited from pursuing other investment-related business opportunities.

**[\*11]** The Principals devoted their full attention to the business. In documents prepared for investors, Soroban explained that Messrs. Mandelblatt, Kapadia, and Friedman devoted 100% of their time to Soroban and the funds it manages.

     D.    *Principals' Capital Contributions and Partnership Distributions*

Only Mr. Mandelblatt contributed assets to Soroban. He contributed $3,539,117 to Soroban in 2010, $800,000 in 2011, and $15,000 in 2013, bringing his total contributions to $4,354,117. The last contribution was not in cash. Mr. Mandelblatt paid an expense on Soroban's behalf in 2011, and Soroban adjusted its balance sheet to reflect this amount in 2013. Approximately 29% of these amounts were used for organizational and startup expenses; the remainder was used for operating expenses.

These cash contributions are the only cash capital contributions Soroban received from the Principals from its formation through December 31, 2017.

Apart from cash, the Principals contributed their know-how, investment track records, and relationships with potential investors to the success of Soroban.

     E.    *Soroban's Advertising and Client Communications*

Soroban advertised the unique skills and talents of the Principals. Soroban advertised to potential investors that the company was managed by the Principals. In the organizational chart displayed in advertisement materials, Mr. Mandelblatt and Mr. Kapadia were on top of the organization, with Mr. Kapadia reporting to Mr. Mandelblatt. In these charts, Mr. Friedman was shown leading a department with two employees.

     1.    *Advertising Materials*

The advertising materials enticed investors with access to the Principals' unique talents. Soroban's Private Placement Memoranda for prospective investors included the Principals' professional biographies. Similarly, Soroban's presentation for prospective investors included the Principals' professional biographies. Soroban's presentations to prospective investors included timelines of each Principal's career.

**[\*12]** Messrs. Mandelblatt, Kapadia, and Friedman were referred to as the "founding partners" of Soroban. Similarly, Messrs. Mandelblatt and Kapadia are each referred to as "Founder" in the "Limited Partnership Agreement of Soroban Capital Partners LP," dated January 1, 2015.

Soroban advertised that "[t]he founding partners have worked together for over a decade and have demonstrated investment success managing teams and capital across asset classes, sectors, geographies and market cycles." Soroban explained that it invests in areas in which Mr. Mandelblatt and Mr. Kapadia "have experience." Soroban explained that it generates ideas by seeking to "leverage its extensive investing experience and network of information and relationships."

Soroban specifically advertised each of the Principals individually. Soroban's advertisements described Mr. Kapadia, as Soroban's comanaging partner. Soroban advertised his experience as a partner at TPG-Axon Capital Management, LP (TPG-Axon), starting in 2004; his experience investing in Europe, Asia, and Latin America across a wide variety of industries; his experience as a strategy consultant; and his graduation with honors from the Wharton School of Business.

Soroban's advertisement described Mr. Friedman as Soroban's head of trading and risk management. Soroban advertised that Mr. Friedman had experience as head trader at TPG-Axon starting in 2006; that he was an analyst in trading for Goldman, Sachs & Co. (Goldman Sachs); and that he graduated with honors from the University of Florida.

Soroban's advertising materials described Mr. Mandelblatt as Soroban's CIO. The materials also showed his experience as a partner at TPG-Axon in 2005; that from 1998 to 2005 he worked at Goldman Sachs; and that he graduated with honors from the University of Florida.

Soroban's advertisements explained that Mr. Mandelblatt's participation in Soroban was critical to the Fund's success. Soroban cautioned that "[t]he success of the Fund will depend, in large part, upon the skill and expertise of the management of Soroban. In the event of the death, disability, or departure of any principals or other key members of Soroban, the business and the performance of the Fund may be adversely affected."

**[*13]**   2.   *Private Placement Memorandum and Due Diligence Questionnaire*

Soroban provided prospective investors with a Private Placement Memorandum, a due diligence questionnaire, and related governing agreements of the relevant funds. In them, Soroban acknowledged that Mr. Mandelblatt was essential to the operation of the business. Soroban explained to its investors that Mr. Mandelblatt generally managed the funds, but in his absence Mr. Kapadia and Mr. Friedman would manage them. If Mr. Mandelblatt died, was permanently incapacitated, or otherwise permanently ceased to be responsible for overseeing the investment of the assets of the fund, a "Key-Man Event" would occur. If a Key-Man Event were to occur, the fund would provide notice to investors within ten days of when Soroban discovered the event. At that point, investors had the option to provide written notice of their intention to withdraw all or a portion of their investment with the fund.

Soroban likewise acknowledged that the Principals were essential to the operation of the business. Soroban explained to its investors that, if all three Principals were unavailable, the funds would liquidate. Materials provided to investors explain that in the event Mr. Mandelblatt were incapacitated, Messrs. Kapadia and Friedman would manage the funds. However, in the event all three Principals were "temporarily or permanently absent from overseeing the investment of the assets of the Funds, the Analysts and COO/CFO would manage the liquidation of the Funds." But for the three Principals, Soroban would not exist.

III.   *Procedural History*

A.   *Respondent's FPAA*

On April 25, 2022, the Commissioner timely issued to petitioner two FPAAs, one each for the years ending December 31, 2016, and December 31, 2017. In these FPAAs, the Commissioner proposed recharacterizing the ordinary income allocated to Soroban's limited partners as net earnings from self-employment. Thus, the Commissioner proposed increasing Soroban's 2016 and 2017 net earnings from self-employment by $77,663,962 and $63,866,302, respectively.

[*14] B.    *Tax Court Proceedings*

With its principal place of business in New York, Soroban filed Petitions with this Court. Shortly thereafter, the parties filed a Motion to Consolidate the two cases. Petitioner filed a Motion for Summary Judgment, asking us to find that section 1402(a)(13) excludes limited partners' distributive shares of income from net earnings from self-employment and thus self-employment tax (SECA) applies only to the Principals' guaranteed payments. For this purpose, petitioner argued that characterization as a limited partner for state law purposes was controlling. The Commissioner objected and filed a Cross-Motion for Partial Summary Judgment. The Commissioner argued that section 1402(a)(13) requires a functional inquiry into the roles of the partners to determine whether they are bona fide limited partners. The parties also disputed whether the Court has jurisdiction in this partnership-level proceeding over any functional inquiry into the partners' roles.

We granted the Commissioner's Motion and denied petitioner's Motion. *Soroban*, 161 T.C. 310. In the Opinion, we held that the section 1402(a)(13) requires a functional inquiry into the roles and responsibilities of the partners, and that such an inquiry concerns a partnership item for the purposes of a TEFRA proceeding. *Soroban*, 161 T.C. at 324. The parties subsequently filed a joint Motion to Submit this Case Pursuant to Rule 122, which we granted.

After the parties filed simultaneous opening and answering briefs, petitioner filed a Motion to Reopen the Record to enter petitioner's Forms 1065 for years before and after those in issue. Petitioner included in its Simultaneous Opening Brief a proposed finding of fact that included tax return information from 2010 through 2023. Information from years 2010 through 2015 and 2018 through 2023 did not appear in the parties' stipulations.

The Commissioner filed a Motion to Strike with respect to the new information. We ordered petitioner to respond. We recharacterized petitioner's response as a Motion to Reopen the Record. The Commissioner filed a response to the Motion to Reopen the Record, explaining that allowing the information would deny the Commissioner the opportunity for cross-examination.

**[\*15]**                                    *Discussion*

I.      *Jurisdiction over FPAA*

The Commissioner's adjustments in an FPAA are generally presumed correct. Rule 142(a). A party challenging an FPAA has the burden of proving that the Commissioner's adjustments are in error. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *see also Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996) ("[The taxpayer] bears the burden of proving that [the Commissioner's] determinations in the FPAA are erroneous."); *Clovis I v. Commissioner*, 88 T.C. 980, 982 (1987) (finding that an FPAA is the functional equivalent of a Notice of Deficiency).

The burden shifts if the taxpayer provides sufficient evidence and meets certain other requirements. Section 7491 specifies that if "a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed," then the Commissioner shall bear that burden "with respect to such issue." I.R.C. § 7491(a)(1). In the case of a partnership, however, this rule applies only if the partnership meets specific net worth requirements. I.R.C. § 7491(a)(2)(C). Petitioner has not established that those requirements have been met. We decide cases on the relative weight of the evidence. *Knudsen v. Commissioner*, 131 T.C. 185, 188 (2008), *supplementing* T.C. Memo. 2007-340. Shifts in the burden have significance only in those rare instances of an evidentiary tie. *Id.* Discerning no tie, we can decide the issues on the preponderance of the evidence. *See Bordelon v. Commissioner*, T.C. Memo. 2020-26, at \*11.

II.     *Tax on Net Earnings from Self-Employment*

Section 1401 imposes a tax on the self-employment income of every individual. I.R.C. § 1401(a) and (b). Section 1402(b) defines "self-employment income" as "the net earnings from self-employment derived by an individual (other than a nonresident alien . . . ) during any taxable year." *See also* Treas. Reg. § 1.1401-1(c) ("[S]elf-employment income consists of the net earnings derived by an individual (other than a nonresident alien) from a trade or business carried on by him as sole proprietor or by a partnership of which he is a member . . . .").

Section 1402(a) defines net earnings from self-employment as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions" attributable to the business, as well as the individual's "distributive share" of income or loss

**[\*16]** from a partnership. But an exception to this rule excludes distributions received by limited partners in a partnership. Specifically, section 1402(a)(13) excludes "the distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments" from net earnings from self-employment.

In his FPAA, the Commissioner proposed increasing the amount of Soroban's income that should be characterized as net earnings from self-employment. Specifically, the Commissioner alleges that Messrs. Mandelblatt, Kapadia, and Friedman were not limited partners for the purpose of section 1402(a)(13). Resolving these cases requires us to determine whether Soroban's partners qualify as limited partners for the purposes of this exception.

We previously decided that section 1402(a)(13) requires a functional analysis. In *Soroban*, 161 T.C. at 324, we found that the Court has jurisdiction to determine whether a state law limited partner should be characterized as a limited partner for federal SECA tax purposes. Further, we held that determining whether a partner should be characterized as a limited partner requires a functional analysis into the roles and responsibilities of the partner. *Id.*

In applying our previous holding, we remain mindful that "federal tax law, and only federal tax law, controls the classification of 'partners' and 'partnerships' for federal tax purposes." *Azimzadeh v. Commissioner*, T.C. Memo. 2013-169, at \*5 (first citing Treas. Reg. § 301.7701-1(a)(1); and then citing *Commissioner v. Tower*, 327 U.S. 280, 288, 290 (1946)). Therefore, we now turn to a functional analysis.

III. *Application of Functional Analysis*

We recently applied a functional analysis in a factually analogous case. *See generally Denham*, T.C. Memo. 2024-114. The test is designed to be a comprehensive inquiry into whether the Principals "were '*generally* akin' to passive investors." *See id.* at \*14 (quoting *Renkemeyer, Campbell & Weaver, LLP v. Commissioner*, 136 T.C. 137, 147–48 (2011)). Under this test, to exclude a partner's distributive share of partnership income from net earnings from self-employment, the surrounding circumstances of the partner's economic relationship with the partnership must sufficiently indicate that it is generally one of passive investment. *Denham*, T.C. Memo. 2024-114, at \*14.

Following our opinions in *Renkemeyer* and *Denham*, we analyze the Principals' roles and responsibilities. As a preliminary matter,

**[\*17]** petitioner bears the burden of establishing that the Principals' distributive shares represented income of an investment nature. *See Howell v. Commissioner*, T.C. Memo. 2012-303, at \*16–17; *see also* Rule 142(a). In analyzing the Principals' roles and responsibilities, we review the sources of Soroban's income for the years in issue, the Principals' roles in generating that income, and the relationship between the Principals' distributive shares and any capital contributions they made to the partnership. *See Renkemeyer*, 136. T.C. at 150.

We applied this test in *Denham*. We looked at the extent to which the partners' time, skills, and judgment were essential to the partnership's income. *Denham*, T.C. Memo. 2024-114, at \*15. We evaluated what roles they played in the business, i.e., whether they served as employees, sat on committees, possessed the authority to bind the partnership, or took part in personnel decisions. *Id.* at \*16–17. We considered the time they devoted to the business. *Id.* at \*16. We looked to how the partnership advertised itself to the public, and whether it advertised any specific skills or expertise of the partners. *Id.* at \*17. And we examined the capital contributed by the partners. *Id.* at \*15–16.

A.    *The Principals' Role in Generating Income*

Soroban generated income from fees it charged its clients for managing investments. The Principals' time, skills, and judgment were essential to these services. The funds were managed by Mr. Mandelblatt. In the event of his temporary absence, Messrs. Kapadia and Friedman would manage the funds. The Principals were responsible for managing risk. They managed trade offers, over which Mr. Mandelblatt had final authority. All three Principals oversaw and participated in the investment process. This work all contributed to the generation of Soroban's income. The fees were substantial, generating approximately $247 million in revenue for Soroban across the years in issue.

B.    *The Principals' Role in Management*

Each of the Principals participated in the management of Soroban. All three Principals served on the Brokerage, Trade Allocation, Management, and Valuation Committees. Through the management committee, Messrs. Mandelblatt, Kapadia, and Friedman made decisions related to hiring, firing, promoting, and evaluating employees. When not acting by committee, the Principals exercised authority delegated to them by petitioner to negotiate and execute any agreement

**[*18]** or document to conduct Soroban's business. The Principals were crucial and active parts of Soroban's business.

Petitioner argues that this work was not done by the Principals alone and that it would be inappropriate to attribute the generation of Soroban's income solely to the Principals. The record makes clear that Soroban employed people other than the Principals to carry out the operations of the business. But the Principals maintained control over the operations of the business, exercising authority over the core functions of Soroban's business.

C.      *The Principals' Time Devoted to the Business*

The Principals devoted significant time to the business. In materials prepared for the investors, Soroban represented that "100% of [the Principals'] time [was] devoted to the management and investment activities of [Soroban] and the funds it manages." Indeed, while no formal time records were maintained, Soroban estimated that the Principals worked 2,300 to 2,500 hours annually during the years in issue. The Principals devoted their full-time efforts to actively pursuing the business of Soroban.

D.      *Marketing the Principals' Role in the Business*

The expertise of the Principals was a selling point for potential investors. In presentations prepared for investors, Soroban advertised the unique skill and experience of the Principals. The skill and experience of Mr. Mandelblatt was so crucial that if he became incapacitated, it would be a key-man event triggering rights notice to investors and the right to withdraw funds on short notice. In addition, if no Principal were available to manage the funds, the funds would liquidate. The Principals were publicly held out as essential to the operation of Soroban.

E.      *The Principals' Capital Contributions*

The Principals' insignificant capital contributions show that their distributive shares of income were not returns on investment. When the size of a partner's investment is relatively small in comparison to the fees the partnership charges for services it provides, the small investment is not sufficient to classify the partner's distributive share as a return on investment. *See Renkemeyer*, 136 T.C. at 150. Messrs. Kapadia and Friedman did not contribute capital to Soroban. Their distributive share was not a return on an investment of capital.

**[\*19]** Although Mr. Mandelblatt contributed capital, his contributions are disproportionate to the distributions he received. Here, *Denham* is instructive. In these cases as in *Denham*, only one partner contributed capital. The sole contributing partner in *Denham*, Mr. Porter, contributed roughly $8 million, and the partnership generated roughly $130 million in revenue during the years in issue. *Denham*, T.C. Memo. 2024-114, at \*3, \*15–16. Mr. Porter's cumulative distributive share was roughly $16 million over the two years in issue. Mr. Mandelblatt contributed far less capital and received a far greater distributive share. Mr. Mandelblatt contributed $4 million, and Soroban generated roughly $247 million of income during the years in issue. Mr. Mandelblatt's cumulative distributive share was $80 million over the two years in issue. The disproportionate income generated does not indicate a return on an investment of capital.

F.    *Petitioner's Additional Factors*

Petitioner proposed its own list of factors for a functional analysis test. The proposed test has nine factors: (1) whether the limited partner was treated as a limited partner under applicable state law; (2) whether the limited partner engaged in any conduct that would result in the limited partner's losing his status as a limited partner under state law; (3) whether the limited partner also held an interest in the partnership as a general partner; (4) whether the limited partner had a capital investment in the partnership; (5) whether the limited partner received separate compensation for any services provided to the partnership; (6) whether the earnings of the partnership were solely attributable to services provided by the limited partners; (7) whether the amount of earnings allocated to each limited partner was determined by reference to the services provided by that limited partner to the partnership; (8) whether the terms of the limited partnership agreement authorized the limited partners, in their capacity as limited partners, to exercise managerial authority or bind the partnership in contracts and in other ways; and (9) whether any persons, other than the limited partners, exercised managerial authority, or held the authority to bind the partnership in contracts and in other ways.

To be clear, the test of whether a partner functions as a general partner or a limited partner for federal tax purposes is not dictated by any set number of factors. Rather, it is a facts and circumstances test that takes into account all relevant facts and circumstances. Those suggested by petitioner are of varying degrees of relevance. We note, however, that many rely to some extent on the label placed on a partner

[*20] for state law purposes. Labels are perhaps least relevant because they may be inconsistent with the economic reality of a partner's relationship with the entity. A partner labeled a limited partner who works for the business full time, whose work is essential to generating the business's income, who is held out to the public as essential to the business, and who contributes little or no capital, is not functioning as a limited partner regardless of the label placed on that partner.

Petitioner relies on the fiction that the Principals did not serve Soroban in their individual capacities as limited partners. Instead, petitioner argues, they acted with authority delegated to them by the general partner, which they in turn had the authority to manage. This type of legal fiction is precisely why application of federal tax law to the economic arrangement of the parties controls, and not mere state law classifications. Soroban relies on Messrs. Mandelblatt, Kapadia, and Friedman to function. Their unique skills and expertise help the business to manage large investment funds, which, in turn, generate income for the business. They participate in the management of the company through committees. If the Principals were unable to participate in the business, clients would have a right to a return of their investments and the funds would liquidate. Thus, the Principals' roles in the business are not those of passive investors.

IV.    *Reopening the Record*

Petitioner requests that we reopen the record to allow the Court to consider tax returns for years not before the Court. In its Simultaneous Opening Brief, petitioner referenced its net income, capital contributions, and partners' capital accounts for 2010 through 2023. The figures reference Form 1065 for each year. The record as initially stipulated did not include the Forms 1065 for years 2010 through 2015 or 2018 through 2023.

Petitioner argues that the Forms 1065 are material to issues presented in these cases. Petitioner further argues that they are responsive to the Commissioner's argument that Mr. Mandelblatt's distributive share cannot be a return on investment because only Mr. Mandelblatt contributed capital to the partnership. The Forms 1065 show that the partners contributed substantial capital to the partnership in 2019, 2020, and 2021 (beyond what Mr. Mandelblatt contributed in 2010, 2011, and 2013). Thus, petitioner argues that distributions are returns on investment. This is a material issue, petitioner asserts, because "[w]hether the Limited Partners are entitled

**[\*21]** to a return on investment is a fundamental point of disagreement between the parties."

The Commissioner objects to the introduction of this material into evidence. Principally, the Commissioner argues that, without an opportunity to examine the information and interview witnesses, the Commissioner is prejudiced by the introduction of this information.

Reopening the record for the submission of additional evidence lies within the discretion of the Court. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 331 (1971); *Butler v. Commissioner*, 114 T.C. 276, 286–87 (2000), *abrogated on other grounds by Porter v. Commissioner*, 132 T.C. 203 (2009). A court will not grant a motion to reopen the record unless, among other requirements, the additional evidence is not merely cumulative or impeaching but is material to the issues involved, and the evidence probably would change the outcome of the case. *Coleman v. Commissioner*, T.C. Memo. 1989-248, 57 T.C.M. (CCH) 493, 495, *aff'd sub nom. Meisel v. Commissioner*, 991 F.2d 795 (6th Cir. 1993) (unpublished table decision).

We balance the moving party's diligence against the possible prejudice to the nonmoving party. *Degourville v. Commissioner*, T.C. Memo. 2022-93, at \*12. Specifically, we consider whether reopening the record after trial would prejudice the nonmoving party by foreclosing their cross-examination of the evidence. *Estate of Freedman v. Commissioner*, T.C. Memo. 2007-61, 93 T.C.M. (CCH) 1007, 1013. To this point, petitioner has made itself available to the Commissioner for additional questions on the evidence presented.

For purposes of deciding whether to allow the additional evidence, we will focus on the question of whether the evidence would change the outcome of the cases. Petitioner included a table purporting to show the Principals' capital investments over time. That table and the tax returns providing the information supporting it are offered in support of petitioner's statement that the Principals' "capital investments in Soroban have fluctuated over time based on the performance of the firm and that in certain years they were required to make substantial additional capital investments to fund losses incurred by the firm."

We begin by noting that nothing in petitioner's table or supporting documents addresses the functional roles of the partners, which is the inquiry required by *Denham*. The data, however, sheds light on the question of whether the Principals' interests and

**[\*22]** distributions were of an investment nature. *See Renkemeyer*, 136 T.C. at 150.

Petitioner offered the following table:

| Tax Year | Net Income (Loss) per Books per Form 1065, Schedule M–2 | Capital Contributed per Form 1065, Schedule M–2 | Year-End Balance of Partners' Capital Accounts per Form 1065, Schedule M–2 |
|---|---|---|---|
| 2010 | ($1,989,670) | $3,539,117 | $1,549,447 |
| 2011 | 9,734,178 | 800,000 | 9,208,625 |
| 2012 | 23,229,139 | -0- | 13,227,857 |
| 2013 | 42,869,824 | 15,000 | 42,526,865 |
| 2014 | 38,833,719 | -0- | 40,266,182 |
| 2015 | 46,673,068 | -0- | 24,060,150 |
| 2016 | 78,073,783 | -0- | 46,485,205 |
| 2017 | 64,717,245 | -0- | 85,472,327 |
| 2018 | (31,034,618) | -0- | 50,367,302 |
| 2019 | (102,557,321) | 91,514,062 | 13,531,775 |
| 2020 | (11,026,784) | 9,003,703 | 11,458,694 |
| 2021 | (33,628,556) | 48,457,500 | 26,237,638 |
| 2022 | 22,786,779 | -0- | 48,974,417 |
| 2023 | 11,854,375 | -0- | 22,083,544 |

And the tax returns offered in support of this table confirm the data presented. What that data shows, however, is not a return typically associated with the passive investment of a limited partner. The following table shows the Principals' combined distributive shares of ordinary income as a percentage of their contributed capital and capital accounts.

| [*23]<br><br>Tax Year | Cumulative Ordinary Income (Loss) of Principals | Capital Contributed per Form 1065, Sch. M–2 | Yearend Balance of Partners' Capital Accounts per Form 1065, Sch. M–2 | Income as a % of Capital Contributions | Income as a % of Capital Account |
|---|---|---|---|---|---|
| 2010 | ($1,951,768) | $3,539,117 | $1,549,447 | −55.15% | −125.97% |
| 2011 | 9,837,284 | 800,000 | 9,208,625 | 1229.66% | 106.83% |
| 2012 | 23,331,698 | -0- | 13,227,857 | N/A | 176.38% |
| 2013 | 43,506,155 | 15,000 | 42,526,865 | 290041.03% | 102.30% |
| 2014 | 39,002,025 | -0- | 40,266,182 | N/A | 96.86% |
| 2015 | 46,687,847 | -0- | 24,060,150 | N/A | 194.05% |
| 2016 | 77,663,962 | -0- | 46,485,205 | N/A | 167.07% |
| 2017 | 63,866,302 | -0- | 85,472,327 | N/A | 74.72% |
| 2018 | (31,264,049) | -0- | 50,367,302 | N/A | -62.07% |
| 2019 | (102,146,314) | 91,514,062 | 13,531,775 | −111.62% | −754.86% |
| 2020 | (11,341,091) | 9,003,703 | 11,458,694 | −125.96% | −98.97% |
| 2021 | (33,152,011) | 48,457,500 | 26,237,638 | −68.41% | −126.35% |
| 2022 | 22,196,616 | -0- | 48,974,417 | N/A | 45.32% |
| 2023 | 10,509,517 | -0- | 1,549,447 | N/A | 53.68% |

To the extent petitioner's additional evidence is relevant, it only reinforces our conclusions. The Principals' shares of ordinary income bear no relationship to their capital contributed or their capital accounts. "Thus it is clear that the partners' distributive shares of the . . . firm's income did not arise as a return on the partners' investment and were not 'earnings which are basically of an investment nature.'" *Renkemeyer*, 136 T.C. at 150 (quoting H.R. Rep. No. 95-702, pt. 1, at 11 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4155, 4168).

Some of the competing principles on whether to reopen the record are in equipoise. That the additional evidence would not prejudice the Commissioner would favor the admission of the evidence. But the reason it would not prejudice the Commissioner is that it would not be likely to change the outcome, which would favor exclusion of the evidence.

The proffered evidence carries with it an additional issue: We cannot receive it in its entirety without reopening the record for yet further information. The Schedules K–1 accompanying the Forms 1065

**[\*24]** show ownership changes beginning in 2020, with one of the Principals apparently departing and a new entity, owned by Mr. Mandelblatt, joining in 2021. The Schedules K–1 show a further ownership change in 2023, as well. Moreover, information for years after the years in issue is of limited probative value. We have no evidence as to what precipitated any changes that occurred in years after the years in issue. And information from those years does not shed light on the capital investments during the years in issue. For the sake of completeness of the record, we will exercise our discretion to supplement the record and grant petitioner's Motion insofar as we will supplement the record to include Soroban's Forms 1065 for 2010 through 2015.

## *Conclusion*

Soroban's limited partners were limited partners in name only. They were essential to generating the business's income, they oversaw day-to-day management, they worked for the business full time, and they were held out to the public as essential to the business. Their capital accounts make clear that their earnings were not of an investment nature. They are not limited partners within the meaning of section 1402(a)(13), and their earnings constitute net earnings from self-employment for the years in issue.

To reflect the foregoing

*Decisions will be entered for respondent.*